JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Gianluca Torresgrossa

### DEFENDANTS

Main Line Healthcare

**(b)** County of Residence of First Listed Plaintiff  Cuyahoga (Ohio)
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Scott M. Pollins, Pollins Law, 303 W. Lancaster Ave., Ste. 1C, Wayne, PA 19087, 610-896-9909

Attorneys *(If Known)*

Paul C. Lantis, Esq. - Little Mendelson

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Diversity - 28 U.S.C. Section 1332(a)

Brief description of cause:
Pa. Whistleblower Law retaliation and breach of employment agreement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND S  Unliquidated

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE  7/31/26

SIGNATURE OF ATTORNEY OF RECORD

---

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

10/2024

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### DESIGNATION FORM

Place of Accident, Incident, or Transaction: _____Wynnewood, PA_____

---

**RELATED CASE IF ANY:** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?                                                    Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?                    Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?       Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?     Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation.       Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A.   Federal Question Cases:**

☐ 1.   Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2.   FELA
☐ 3.   Jones Act-Personal Injury
☐ 4.   Antitrust
☐ 5.   Wage and Hour Class Action/Collective Action
☐ 6.   Patent
☐ 7.   Copyright/Trademark
☐ 8.   Employment
☐ 9.   Labor-Management Relations
☐ 10.  Civil Rights
☐ 11.  Habeas Corpus
☐ 12.  Securities Cases
☐ 13.  Social Security Review Cases
☐ 14.  Qui Tam Cases
☐ 15.  Cases Seeking Systemic Relief *see certification below*
☐ 16.  All Other Federal Question Cases. *(Please specify)*:_____

**B.   Diversity Jurisdiction Cases:**

☐ 1.   Insurance Contract and Other Contracts
☐ 2.   Airplane Personal Injury
☐ 3.   Assault, Defamation
☐ 4.   Marine Personal Injury
☐ 5.   Motor Vehicle Personal Injury
☐ 6.   Other Personal Injury *(Please specify)*:_____
☐ 7.   Products Liability
☒ 8.   All Other Diversity Cases: *(Please specify)*_____
       Pa. Whistleblower Law

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

### ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GIANLUCA TORREGROSSA** | : | |
| Plaintiff | : | **CIVIL ACTION NO.** |
| v. | : | |
| **MAIN LINE HEALTHCARE** | : | **JURY TRIAL DEMANDED** |
| Defendant | : | |

## COMPLAINT

**I.    INTRODUCTION**

1.   Plaintiff Gianluca Torregrossa, (Dr. Torregrossa) brings this action against his former

employer, Defendant Main Line HealthCare ("MLHC"), for retaliation under the Pennsylvania

Whistleblower Law, 43 P.S. §§ 1421-1428, and breach of contract.

2.   Dr. Torregrossa is an internationally recognized cardiothoracic surgeon and robotic

coronary revascularization specialist whom MLHC recruited to build and lead its robotic

coronary surgery and coronary revascularization program at Lankenau Medical Center and the

Lankenau Heart Institute.

3.   During his employment, Dr. Torregrossa repeatedly reported serious patient-safety

and quality-of-care concerns involving MLHC's cardiac surgery program, including repeated

adverse surgical outcomes, failure to rescue patients, refusal to obtain emergent coronary

angiography despite objective evidence of myocardial ischemia or graft failure, incomplete

operative documentation, incomplete disclosure of intraoperative complications, suppression of

objective postoperative findings, and institutional failure to investigate repetitive adverse

outcomes.

4.   Instead of meaningfully investigating those concerns, MLHC marginalized Dr.

Torregrossa, stripped him of clinical and program authority, excluded him from research and

recruitment decisions, diverted surgical opportunities, suspended him on February 5, 2026, and terminated him on or about March 12, 2026.

5.   MLHC's actions caused substantial economic, professional, reputational, immigration-related, and personal harm, including approximately three months of lost employment, disruption of his O-1 visa status, forced relocation, separation from his wife and daughter, damage to his standing in the specialized cardiac surgery community, interruption of a highly technical robotic coronary surgery practice, and loss of the program he had built at MLHC.

## II.   JURISDICTION AND VENUE

6.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this action is between Dr. Torregrossa, an Italian citizen domiciled in Ohio, and MLHC, a Pennsylvania nonprofit corporation.

7.   Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action occurred in the Eastern District of Pennsylvania, including at Lankenau Medical Center in Wynnewood, Pennsylvania, and because MLHC resides and conducts business in this District.

## III.   PARTIES

8.   Dr. Torregrossa resides in Ohio, and he is a citizen of Italy.

9.   MLHC is a Pennsylvania non-profit corporation located at 240 North Radnor-Chester Road, Suite 300, Radnor, PA 19087.

10. MLHC is affiliated with Main Line Health, Inc., a Pennsylvania nonprofit corporation that sponsors a community-based health-care delivery system through subsidiary organizations.

2

MLHC' hospitals include Lankenau Medical Center, Bryn Mawr Hospital, Bryn Mawr Rehabilitation Hospital, Paoli Hospital, and Riddle Hospital.

11. MLHC employed Dr. Torregrossa to provide cardiothoracic surgery services primarily at Lankenau Medical Center and the practice offices maintained on the Lankenau Medical Center campus in Wynnewood, Pennsylvania.

12. MLHC is an employer under the Pennsylvania Whistleblower Law because it is a nonprofit corporation that receives money from public bodies, including Medicare and Medicaid, to perform work or provide services, including health-care services.

IV.    **FACTUAL BACKGROUND**

   **A. Recruitment, employment agreement, and promised role**

13. MLHC recruited Dr. Torregrossa in 2021 to build and expand its robotic coronary surgery and coronary revascularization program. His recruitment was based on his specialized expertise in coronary artery bypass grafting, robotic coronary surgery, and totally endoscopic coronary artery bypass surgery, known as TECAB.

14. On January 26, 2021, Dr. Torregrossa and MLHC executed an Employment Agreement effective July 1, 2021. The Employment Agreement provided for a term continuing through June 30, 2026, unless sooner terminated under the Agreement.

15. Dr. Torregrossa's contractual duties included providing professional medical services customarily performed by physicians practicing cardiothoracic surgery, providing hospital and office coverage, participating in call coverage, and exercising independent professional judgment in patient care.

16. The Employment Agreement provided annual salary increasing from $800,000 in the first annual term to $940,000 in the fifth annual term. The Agreement also provided for an

3

incentive bonus of up to $100,000 each annual term based on new patient consultations, group growth, quality of care, and scholarly activity.

17. MLHC agreed to provide staff, facilities, equipment, and supplies reasonably necessary for Dr. Torregrossa to perform his duties. MLHC and related Main Line entities also confirmed support for the robotic coronary program and research infrastructure, including support for an additional robotic console, research fellow funding, a director title, and faculty-position support.

18. Dr. Torregrossa was appointed Director of Robotic Coronary Surgery and Coronary Revascularizations at Lankenau Medical Center and the Lankenau Heart Institute. That title reflected the central purpose of his recruitment: to build a nationally significant robotic coronary surgery platform, expand advanced coronary revascularization, develop academic output, and grow the program's clinical reputation.

19. In reliance on MLHC's contractual and institutional commitments, Dr. Torregrossa relocated his family and committed his clinical and academic career to MLHC.

**B. Program success and clinical performance**

20. Dr. Torregrossa successfully built the program MLHC recruited him to create. He built a nationally and internationally recognized robotic coronary and TECAB program, expanded referral pathways, performed more than 80 TECAB procedures, achieved strong outcomes, and produced peer-reviewed research.

21. His practice grew through local, out-of-state, and international referrals. He developed one of the rare programs capable of offering totally endoscopic coronary artery bypass surgery, a highly technical procedure performed by only a small number of surgeons worldwide.

22. In March 2025, MLHC's 360-degree review reflected strong clinical ratings for Dr. Torregrossa in sound judgment, compassion, patient safety, communication, and teaching. Reviewers praised his patient care, availability, communication, bedside presence, surgical skill, and potential to expand into additional procedures.

23. Reviewers also encouraged MLHC to allow Dr. Torregrossa to broaden his clinical work, including into robotic mitral valve surgery. Those internal assessments contrasted sharply with MLHC's later attempt to portray him as disruptive, unprofessional, or unfit to continue practicing within the institution.

**C. Key individuals involved in the cardiac surgery program**

24. Dr. Francis Sutter was a senior cardiac surgeon at Lankenau Heart Institute and Main Line Health. He was also a senior robotic surgeon involved in Dr. Torregrossa's recruitment and he discussed the possibility that Dr. Torregrossa would take over and expand the robotic coronary practice Dr. Sutter had built.

25. Dr. Basel Ramlawi was the Chair of Cardiothoracic Surgery at Main Line Health and participated in Dr. Torregrossa's recruitment. As Chair, Dr. Ramlawi exercised substantial influence over clinical program development, surgeon recruitment, case allocation, and departmental politics.

26. Dr. Scott Goldman was a senior mitral valve surgeon at Main Line Health who supported Dr. Torregrossa's involvement in a robotic mitral program because Dr. Torregrossa had prior robotic mitral experience.

27. Trish Senss chaired the morbidity and mortality conference and received requests from Dr. Torregrossa to review cases involving complications.

5

28. Barbara Wadsworth was President of Lankenau Hospital during key events in 2025 and 2026. Dr. Donald Klingen was President of MLHC.

29. Dr. Mariano Brizzio was a newly hired coronary surgeon whom MLHC later claimed Dr. Torregrossa refused to speak with. That allegation became one of MLHC's stated grounds for suspending Dr. Torregrossa, even though Dr. Brizzio later denied that any such incident occurred.

**D. Early patient-safety concerns and internal reporting**

30. Throughout his employment at MLHC, Dr. Torregrossa made internal protected reports through institutional channels, including morbidity and mortality review, meetings, written requests for case review, discussions with leadership, and communications with physicians involved in quality and patient-safety oversight.

31. In October 2022, Dr. Torregrossa became concerned about the care of MMR, a patient who underwent elective CABG by Dr. Sutter, deteriorated postoperatively, and later required heart transplantation. Dr. Torregrossa believed timely catheterization could have identified graft failure earlier and potentially prevented irreversible myocardial injury.

32. In October and November 2022, Dr. Torregrossa became concerned about the case of JG, who underwent triple CABG and was later readmitted in cardiogenic shock with all grafts occluded.

33. The above cases formed part of an early pattern that caused Dr. Torregrossa to question whether postoperative deterioration and graft-failure concerns were being promptly and transparently investigated.

34. In September 2023, Dr. Torregrossa formally requested morbidity and mortality review of seven Dr. Sutter cases involving a repetitive series of complications. Those cases were

6

discussed only superficially, no meaningful follow-up was initiated, and the pattern of complications involving a single surgeon was not examined.

35. In March 2024, Dr. Torregrossa became concerned about the case of FC, an approximately 90-year-old patient who underwent elective robotic CABG, required conversion to sternotomy after intraoperative complications, later returned in cardiogenic shock, and died weeks later.

36. In August 2024, Dr. Torregrossa became concerned about the case KC, whose elective robotic CABG was complicated by LAD and LIMA dissection, conversion to sternotomy, and death days after discharge. Dr. Torregrossa believed that the handling of postoperative evaluation and documentation in that case raised serious patient-safety and transparency concerns.

37. In May 2025, Dr. Torregrossa again requested review of several Dr. Sutter cases that he believed involved serious complications but had not been included for morbidity and mortality discussion. Although those cases were added for discussion, no follow-up was recommended despite Dr. Torregrossa's concern about a repetitive pattern of complications.

38. Dr. Torregrossa also raised concerns about patient distribution and case assignment, including that Mary Ann Wartan, Dr. Sutter's long-time assistant, controlled referrals and case distribution in a way that favored Dr. Sutter. Dr. Torregrossa believed the patient-allocation process undermined patient choice, program development, and fair assignment of cases based on patient complexity and surgeon expertise.

39. Dr. Torregrossa's internal reports concerned patient safety, quality of care, professional ethics, accurate operative documentation, institutional accountability, and protection of current and future patients. The substance of his reports included failure to rescue, refusal to

7

perform emergent coronary angiography, incomplete documentation, failure to disclose complications, suppression of objective postoperative findings, repeated adverse outcomes, institutional failure to investigate, and retaliation against physicians raising patient-safety concerns.

40. These were reports of wrongdoing or waste under the Pennsylvania Whistleblower Law (PaWBL).

**E. Marginalization after whistleblower reporting of wrongdoing and waste**

41. As Dr. Torregrossa continued raising patient-safety concerns, MLHC increasingly marginalized him within the cardiac surgery program. MLHC's actions reduced his authority as Director of Robotic Coronary Surgery and Coronary Revascularizations and undermined the very program he had been recruited to lead.

42. Dr. Ramlawi and Dr. Sutter excluded Dr. Torregrossa from recruiting another robotic coronary surgeon even though he was Director of Robotic Coronary Surgery and Coronary Revascularization. MLHC later used Dr. Torregrossa's comments during a brief interview with Dr. Danielle Spragan, a surgeon recruited by Dr. Ramlawi and Dr. Sutter, to create an HR event portraying him as unwelcoming.

43. That HR event reflected a broader pattern in which routine professional interactions involving Dr. Torregrossa were escalated against him, while more serious concerns involving others, like patient safety, were not meaningfully investigated. MLHC's selective use of HR discipline later became part of the pretextual record used to justify his removal.

44. MLHC excluded Dr. Torregrossa from the robotic mitral valve program despite his prior robotic mitral experience and support from Dr. Goldman. That exclusion was inconsistent

with Dr. Torregrossa's clinical background, his internal support from the senior mitral valve surgeon, and MLHC's stated interest in developing advanced robotic cardiac surgery.

45. MLHC failed to meaningfully promote the TECAB program that Dr. Torregrossa launched in January 2024, even though it was the type of advanced robotic coronary program he was recruited to build. The absence of institutional promotion limited the growth and visibility of the program and undermined Dr. Torregrossa's contractual role.

46. MLHC diverted cases, interfered with referral streams, and reassigned surgical opportunities away from Dr. Torregrossa. In September 2025, patient DF complained that Dr. Ramlawi misrepresented Dr. Torregrossa's availability and attempted to push him toward a non-robotic procedure.

47. MLHC also excluded Dr. Torregrossa from scholarly work he helped design, coordinate, and supervise. Despite notice that he had been removed from authorship on research to which he substantially contributed, his name was never restored.

48. The clinical, academic, and administrative marginalization of Dr. Torregrossa was not isolated. It reflected a continuing pattern of retaliation, unequal enforcement, and program suppression following his patient-safety complaints.

**F. Non-renewal and continued patient-safety reporting**

49. On November 5, 2025, MLHC notified Dr. Torregrossa that it would not offer him a new employment agreement after June 30, 2026. The non-renewal notice gave no performance-based explanation.

50. After the non-renewal, Dr. Torregrossa continued to report patient-safety concerns. In November 2025, Dr. Torregrossa and his wife, Dr. Leila Hosseinian, met with Barbara

9

Wadsworth and discussed a lack of safety culture, repeated complications involving Dr. Sutter, and related concerns involving other surgeons.

51. In January 2026, Dr. Torregrossa became concerned about the case of EM, whose surgery allegedly involved innominate vein laceration, LAD ligation, extreme troponin elevation, new wall-motion abnormalities, and refusal of emergent coronary angiography.

52. Dr. Torregrossa personally urged Dr. Sutter to obtain immediate left heart catheterization for EM and contacted Dr. Tim Shapiro, Director of the Cardiac Catheterization Laboratory at Main Line Health, when no action was taken. Despite those efforts, no emergent angiography was performed.

53. By January 2026, after years of internal reports that did not lead to meaningful corrective action, Dr. Torregrossa submitted external patient-safety complaints. On about January 22, 2026, he submitted a complaint through the Pennsylvania Licensing System and he also submitted a safety-event report to The Joint Commission.

54. On January 28, 2026, Dr. Torregrossa anonymously circulated a patient-safety letter regarding Dr. Sutter. The letter identified specific cases, and requested peer-review, credentialing, and quality-assurance review of Dr. Sutter's privileges to protect patients.

55. The January 2026 reports were not the beginning of Dr. Torregrossa's protected activity. They were the culmination of years of internal reporting that MLHC and Main Line leadership failed to meaningfully investigate or remediate.

56. On about January 30, 2026, the Joint Commission made a surprise unannounced visit to Lankenau Hospital.

**G. February 5, 2026 suspension**

57. On February 5, 2026, MLHC placed Dr. Torregrossa on paid administrative leave and barred him from accessing Main Line Health facilities, resources, and patient information. As a practical matter, the suspension removed him from active clinical practice, separated him from patients, and prevented him from continuing the specialized surgical work MLHC had recruited him to perform.

58. MLHC claimed that Dr. Torregrossa had disparaged Main Line Health during a January 23, 2026 Grand Rounds presentation at Riddle Hospital. MLHC also claimed that he engaged in unprofessional conduct by refusing to speak to Dr. Brizzio.

59. MLHC invoked Sections 6.2(b)(viii) and (ix) of the Employment Agreement and stated it was entitled to terminate Dr. Torregrossa immediately.

60. Section 6.2(b)(viii) concerns disparaging or discrediting MLHC's reputation in the community, and Section 6.2(b)(ix) concerns certain policy and documentation failures after notice of deficiencies and remedial instruction.

61. MLHC's stated reasons were pretextual. The recorded Grand Rounds presentation did not contain disparaging remarks about Main Line Health, did not disclose confidential or proprietary information, and did not reasonably harm the institution or its patients.

62. The Brizzio allegation was also false. Dr. Brizzio told Dr. Torregrossa that he had never experienced any incident in which Dr. Torregrossa refused to speak with him or behaved in an unprofessional or unwelcoming manner.

63. Dr. Brizzio further reported that Main Line Health leadership contacted him and appeared to seek confirmation that Dr. Torregrossa had acted inappropriately despite Dr. Brizzio indicating that no such incident occurred.

64. MLHC's suspension of Dr. Torregrossa occurred within days of his late-January patient-safety reports and closely followed years of internal safety complaints and the surprise unannounced visit from the Joint Commission. The temporal proximity, false Brizzio allegation, lack of support in the Grand Rounds recording, and selective use of disciplinary mechanisms support an inference that MLHC suspended Dr. Torregrossa because of his protected patient-safety reports.

**H. March 12, 2026 termination and damages**

65. On or about March 12, 2026, MLHC officially terminated Dr. Torregrossa's employment and stopped paying him.

66. Dr. Torregrossa began working at Cleveland Clinic on June 15, 2026, leaving an employment gap of approximately three months. During that period, he lost salary, benefits, retirement contributions, incentive compensation, bonuses, and other contractual payments.

67. Because Dr. Torregrossa's authorization to work in the United States was tied to MLHC's O-1 visa sponsorship, he required new sponsorship from Cleveland Clinic. He was required to return to Italy for consular processing and was separated from his wife and daughter for a period of time.

68. Dr. Torregrossa incurred immigration, legal, travel, moving, housing, and relocation expenses. His family was forced to relocate from Pennsylvania to Ohio, and his wife and daughter suffered disruption to their professional, educational, and personal lives.

69. The interruption of Dr. Torregrossa's practice caused professional harm because robotic TECAB is highly technical and requires continuous operative practice. Being removed from practice for approximately three months deprived him of the ability to operate, teach, proctor, maintain case volume, and continue refining a rare and demanding surgical technique.

12

70. MLHC's actions damaged Dr. Torregrossa's reputation in the specialized cardiac surgery community. Cardiac surgery is a small professional field, and news of his suspension and termination spread nationally and internationally, creating questions about his professional standing despite his clinical outcomes and subsequent employment by Cleveland Clinic.

71. MLHC's actions also deprived Dr. Torregrossa of the program he built at Lankenau and harmed his academic trajectory, including through unresolved exclusion from authorship on research to which he substantially contributed.

72. MLHC's actions caused emotional distress, humiliation, family disruption, reputational damage, career harm, academic harm, immigration disruption, and other economic and non-economic damages.

## V.    CLAIMS

### Count I – PaWBL

73. Paragraphs 1 through 72 are incorporated by reference as if fully set forth herein.

74. The PaWBL prohibits an employer from discharging, threatening, discriminating, or retaliating against an employee regarding compensation, terms, conditions, location, or privileges of employment because the employee makes a good-faith report, verbally or in writing, to the employer or appropriate authority, of wrongdoing or waste.

75. Pennsylvania's MCARE Act requires medical facilities to establish systems for health-care workers to report serious events and incidents and prohibits retaliation against health-care workers for reporting such events. A health-care worker's report of a serious event or incident under MCARE is protected by the PaWBL.

76. Dr. Torregrossa made repeated good-faith reports of wrongdoing and waste. He reasonably believed the concerns he reported involved violations that were not technical or

minimal, including violations of patient-safety law, medical-facility reporting obligations, professional and ethical standards, codes of conduct, and standards designed to protect patients and the public.

77. Dr. Torregrossa made those reports internally to MLHC and Main Line Health leadership and externally to appropriate authorities. His protected reports began years before the February 5, 2026, suspension and March 12, 2026, termination.

78. MLHC knew or believed that Dr. Torregrossa made those reports. MLHC retaliated against him because of his reports.

79. MLHC's retaliation included marginalizing his program authority, diverting surgical cases and referrals, excluding him from recruitment and research activity, weaponizing HR processes, issuing the November 5, 2025, non-renewal notice, placing him on administrative leave on February 5, 2026, removing him from clinical practice, barring his access to facilities and patient information, and terminating him on or about March 12, 2026.

80. The February 5, 2026 suspension and March 12, 2026 termination were materially adverse employment actions. The causal connection between Dr. Torregrossa's protected reports and MLHC's adverse actions is shown by temporal proximity, pretextual explanations, selective enforcement, disparate treatment, and MLHC's reliance on allegations contradicted by available evidence.

81. MLHC's asserted reasons for the February 5, 2026 suspension were pretextual because the Grand Rounds recording did not support the disparagement allegation and Dr. Brizzio denied the alleged unprofessional conduct.

82. MLHC's actions violated the Pennsylvania Whistleblower Law.

14

83. As a direct and proximate result of MLHC's violation, Dr. Torregrossa suffered lost compensation, lost benefits, lost retirement contributions, lost incentive compensation, immigration and legal expenses, travel expenses, moving and relocation expenses, temporary housing expenses, reputational harm, career harm, academic harm, emotional distress, humiliation, family disruption, and other damages.

**WHEREFORE**, Plaintiff Dr. Gianluca Torregrossa respectfully requests that this Court enter judgment in his favor and against Defendant Main Line HealthCare and award all available relief, including back pay, front pay (reinstatement not feasible), lost benefits, actual/compensatory damages for emotional distress, humiliation, reputational harm, career harm, immigration-related harm, relocation and transition expenses, interest, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## Count II – Breach of Contract

84. Paragraphs 1 through 72 are incorporated by reference as if fully set forth herein.

85. Dr. Torregrossa and MLHC entered into a valid and enforceable Employment Agreement. The Employment Agreement became effective July 1, 2021 and continued through June 30, 2026 unless sooner terminated under the Agreement.

86. The Employment Agreement required MLHC to pay Dr. Torregrossa salary, benefits, and earned compensation through the contractual term unless MLHC properly terminated the Agreement.

87. The Employment Agreement required MLHC to provide support staff, facilities, equipment, and supplies reasonably necessary for Dr. Torregrossa to perform his duties.

88. The Employment Agreement permitted immediate termination only under specific contractual circumstances. MLHC invoked Section 6.2(b)(viii), which concerns disparagement

15

or discrediting of MLHC's reputation in the community, and Section 6.2(b)(ix), which concerns certain policy and documentation failures after notice of deficiencies and remedial instruction.

89. MLHC breached the Employment Agreement by suspending and terminating Dr. Torregrossa without a legitimate contractual basis. MLHC's reliance on alleged Grand Rounds disparagement was improper because the recording did not contain disparaging remarks, confidential disclosures, or anything reasonably harmful to MLHC or patients.

90. MLHC breached the Employment Agreement by stopping Dr. Torregrossa's compensation after March 12, 2026, despite the Agreement's term continuing through June 30, 2026 absent proper termination. MLHC also failed to pay salary, benefits, incentive compensation, and other amounts owed through the contractual term.

91. MLHC breached the Employment Agreement and related commitments by failing to provide the clinical opportunity, support, program infrastructure, and resources reasonably necessary for Dr. Torregrossa to perform the role for which he was recruited.

92. MLHC breached the Employment Agreement and related commitments by stripping Dr. Torregrossa of program authority, excluding him from decisions concerning the coronary and robotic program he directed, diverting cases and referrals, failing to support the TECAB program, and undermining the practice he was hired to build.

93. MLHC breached the Employment Agreement and related commitments by depriving Dr. Torregrossa of research support, academic recognition, and scholarly opportunities contemplated by the employment relationship.

94. MLHC further breached the Employment Agreement by invoking the restrictive covenant and non-compete structure in a manner that forced Dr. Torregrossa to relocate and compounded the harm caused by MLHC's wrongful suspension and termination.

16

95. Dr. Torregrossa performed his obligations under the Employment Agreement or was excused from further performance by MLHC's breach.

96. MLHC's breaches caused unpaid salary, lost benefits, lost incentive compensation, lost contractual payments, lost retirement contributions, immigration and legal expenses, relocation expenses, temporary housing expenses, reputational and career harm, academic harm, and other consequential damages.

97. MLHC's breaches also caused professional harm because interruption of Dr. Torregrossa's highly specialized TECAB practice deprived him of continuous operative practice required to maintain peak technical performance.

**WHEREFORE**, Plaintiff Dr. Gianluca Torregrossa respectfully requests that this Court enter judgment in his favor and against Defendant Main Line HealthCare and award damages for breach of contract, including unpaid salary, lost benefits, lost incentive compensation, lost contractual payments, retirement losses, consequential damages, immigration and relocation expenses, reputational and career damages, academic damages, interest, costs, and such other relief as the Court deems just and proper.

Respectfully submitted,

By:    *Scott M. Pollins*
Scott M. Pollins
**Pollins Law Firm**
303 W. Lancaster Ave., Ste. 1C
(610) 896-9909 (phone)/(610) 896-9910 (fax)
scott@pollinslaw.com (email)

Mark J. Geragos (seeking pro hac vice admission)
**Geragos & Geragos, APC**
644 South Figueroa Street
Los Angeles, CA 90017
(213) 625-3900 (phone)

17

mark@geragos.com (email)

Date:    7/31/26            Attorneys for Plaintiff, Dr. Gianluca Torresgrossa

18